OCEANEERING CO. v. Oceaneering Interna May it please the Court, Michael Orlando for Oceaneering. I want to begin my argument by asking the Court to think back to the actual beginning of the underlying dispute, which was approximately 14 years ago. At that point, Chevron had its Genesis spar commissioned, and it had issues with the riser system that caused an actual crack in the hull. And while that part of the case is not part of this case in the sense that there was no lawsuit filed over the original repairs to the Genesis spar, it does play into this case in the sense that when the riser system lacks stability, it can cause immense problems, and particularly perhaps a crack in the hull of an offshore spar sitting in 2600 feet of water that can be catastrophic. That was the beginnings of this case, because at that point Chevron commissioned a company called Ocker to redesign the riser system, and everything relating to this case came out of that redesign. The redesign related to bolts that were bought, that were the wrong bolts, that were installed in the bumper system, that were reinstalled in the risers, and bolt heads came off, and it was determined that the bolts were actually defective bolts also, that they were not heat treated and stress relieved, and therefore every one of the approximately 1900 bolts had to be replaced. So the underlying case had to do with actual repairs to the Chevron spar that my opposing counsel continues to characterize as nothing but replacement costs that were nothing but economic losses and therefore fit within his characterization of there's no property damage that could be the basis of a general liability claim. Now, the property damage that you claim should be reimbursed or the replacement of all the bolts, is that it? Your Honor, actually, no. What we claim has to be reimbursed is a contractual indemnity claim, and that's the confusing part about how this case is in its present posture. At bottom, isn't it a coverage case? I'm sorry, Your Honor? At bottom, isn't it a coverage case? This is a coverage case, and the coverage case, though, it's not about damages that Oceaneer paid to Chevron, which would be damages for whatever came out of the original underlying trial of the case. I understand that. It's a question of whether you have to indemnify an acre. Right, which that was what I call in the briefs Chevron 2. Chevron 1 was the original trial of Chevron Seward & Ocker, Oceaneer, the bolt manufacturer, and so on, each party being held responsible for their particular percentage of fault. Oceaneer, 5% of fault. Oceaneer paid that claim. In fact, the insurer here, which is Oceaneer's insurer, paid Oceaneer $150-something thousand dollars that was part of the original damage of Chevron 1. Chevron 2 was the contractual indemnity claim itself, and this court held that Oceaneer was responsible to Ocker under the Chevron Master Services Agreement for what Ocker had to pay to Chevron for Ocker's damages it caused to Chevron. So the confusion here is that American Home Insurance Company wants to use what is in essence the business risk exclusions in the GL policy, which are – every one of which are tailored to your work, your product. And this is not a case of Oceaneer's work or Oceaneer's product. So the case on – the point on which the underlying court in what is now going to be, I guess, termed Chevron 3 is that Judge Hittner ruled that it was the sistership exclusion that applied here. Not the your work, not the your product, not the impaired property exclusions, which are also business risk exclusions. Those are not part of this case. One would think in reading my opposing counsel's briefs that we really were here on the your work, your product, or impaired property exclusions because that's what's mentioned. That's the case law that is relied upon by opposing counsel, and that's not true. What's true is that what had to be shown in the underlying case for our claims to be dismissed was that it was the sistership exclusion that applied. Sistership exclusion had absolutely no application to the facts of this particular case, and that is particularly true because what we're here about is Acker's work. But don't you – before you get to the exclusion, don't you have to cover the ground or whether it's covered in the first place? If Your Honor is referencing property damage, yes, Your Honor. Absolutely there – we have no position, no leg to stand on here if there is no property damage. We freely admitted that in the underlying case. It's true without – because this is not a bodily injury case. It involves nothing else in the CGO policy but for there being property damage. The interesting part about this case when this Court reads the record on Peel is that you will find there's literally zero discovery in the underlying case. No depositions taken, no interrogatories. There were some disclosures, federal disclosures that were done, and there's a reason for that. I mean take me through the definition of property damage and tell me how you say it applies here. The policy defines property damage as physical injury to tangible property, including all resulting loss of use of that property, as well as loss of use of tangible property that is not physically injured. Is that the entire definition? Yes, Your Honor. That's the definition. And our contention all along has been is that that issue was decided in Chevron 1. Chevron 1 has what must be half a dozen references in the case to the Genesis spar having to be repaired and that the classification of damages that was involved in Chevron 1 was that it was damage to other property, the spar. That's a specific reference at least once or twice in Chevron 1. All right, but there's a good argument that that case was dealing with different issues and in a different context. So just for sake of argument, let's say that that doesn't help you and you've got to show it here. So take us through it. Well, I don't know how to do that without a reference, Your Honor, to the underlying facts of the case. Well, you can make reference to the facts but not the holding of our language in the right way. Yes, and that was part of the reason that I began the way I did was that this case, and it's not the case, but the underlying facts began when there was an issue with the riser system on this newly commissioned spar. The riser system itself, which stretches 2,600 feet down to the ocean floor, had an issue with stability, and it actually led to a crack in the hull, which there was apparently no lawsuit ever filed over any of that, and therefore Chevron commissioned Ocker to come in and redo the riser system because of the potential consequences of there perhaps being another crack in the hull of the spar. So that's what was being done was that the bumper guide frames and the riser system itself were being reengineered, redone, and that's when the bolts that are at issue had to be replaced, and so it all ties back in to what happened. Oh, wait a minute. I didn't understand that. The bolts were put in before this whole redo of the riser system? Is that what you're trying to say?  The second time the riser system was— As a part of the redoing of the riser system? Yes. The bolts were in store? Yes. Okay, that's what I thought. That's true. These bolts had nothing to do with the original crack in the hull of the Genesis spar, but the bolts are part of that entire riser system that needed to be— Well, what was the damage? What was the damage to the spar that the court the first round was talking about? Never mind getting into the first round. What was the damage to the spar? As I understand this type of insurance, if all you're going to do is replace a defective part, that is not covered by the property damage provision.  What was the damage? Was it they sheared off the tops of these bolts or what? What was the damage to the spar? It is not clear from the Chevron 1 case or the Chevron 2 case exactly what damage this court held in Chevron 1 was damage to the spar. It was the record in this case, yes. The record in this case does not contain the entire trial transcript of— Well, you had a summary judgment. You were free to put other evidence in, I take it. Right. Yes, Your Honor. And I can't tell you because I don't know because it didn't come out in the record, as best I can tell, what the physical damage, the tangible property was, other than that issue was squarely before this court in Chevron 1. And the issue was squarely before the court. It had to decide in Chevron 1 whether this Chevron 1 was an economic loss, which meant damage to the bolt itself, or damage to the spar. That was the issue. The principal issue of Chevron 1 was the attorney's fees that Chevron claimed that was being appealed. They were—Chevron was not entitled to those attorney's fees. What I'm asking you to do is get in the weeds and tell me how—when those two bolts popped off, what other damage was done. I am assuming, Your Honor, and I'm readily admitting this is an assumption, but it had to do with stability of the riser system. When you have the riser system dependent on bolts and riser guide frames that shear off and you know that all of the bolts are defective, that's not really been challenged here. Every one of the bolts that are an issue in the original case, I believe there were 1,900 of them, you can find passages in either Chevron 1 or Chevron 2 saying all of those bolts were determined to be defective because they weren't stress-tested or heat-treated. Okay, what I hear you saying is when those two bolts sheared off, the stability of the riser was threatened. Was there any physical damage other than otherwise to the riser? There's nothing in the record on appealing or in the underlying record, as best I could ever tell. The settlement or the money that Acre was required to pay, let's say the judgment in the underlying case, was that for replacement of all the bolts? Is that everything that was included in the judgment? That was everything. It was the repairs, what this court characterized as repairs to the Genesis spar. They didn't care. I mean, you can find passages in Chevron 1. I can't recall if there's a reference to repairs to the spar in Chevron 2, but you will find references to this court characterizing the damages to the spar as repairs. Okay, I'm about to run out of time, and I'm still trying to get you to look at the language of the policy. In other words, the only physical injury to tangible property that I have been aware of was those two bolts that sheared off. Bolts shearing off, and actually American Home characterizes that as property damage. You will find that they say there's not a single thing in the record where you'll be able to point to physical damage, yet in their brief they admit that there was property damage in certain instances. How do we get to other property damage? It's the spar. Plainly stated, it's the bolts are the property that would be the economic loss claim if this is all we're doing is we're paying for the bolts and actually unscrew and screw another bolt in. Well, that probably wouldn't have cost $3 million. That was the basis for the amount of damages in the underlying case. This was a case of it actually caused. Chevron 1 does not say instability of the spar, but it does say the spar had to be repaired, and if you're repairing it, the court could have said we're only going to, this case concerns nothing but the payment for damage to the bolts themselves, or to put the new bolts in, but it didn't say that. It said this was not an economic loss claim and that it was a damage to other property claim, and the other property it specified was the spar. Okay. I can't tell you why it said what it said, but it's in there. Thank you very much. Okay, Mr. Bale. May I proceed? May it please the court. Hal Holbrook, who played in the movie All the President's Men, holds a key block from something he said in that movie to this case. You'll recall he played the Nixon White House informant who talked to Bob Woodward and Carl Bernstein about how they could find out who was involved in the Watergate break-in, and in that movie he looked at those guys in the dark recesses of the night in a parking garage and said, follow the money, and if we follow the money in this case, we will see that there wasn't a thin dime that was awarded to Chevron that related to any physical loss, physical damage to tangible property. Now, if we go back in time like Mr. Orlando did, here's a little bit of a timeline. There were some bolts that broke in 2001. They thought it was just over-torquing. Then in September, I'm sorry, July 15th of 2002, Oceaneering was doing a survey and they saw some more broken heads off some bolts. So they were charged with doing a survey in July of 2002, and at that point Chevron, Auker, Detonorscape Veritas, and others, including Oceaneering, formed what they called a carriage bolt review team. They didn't form a review team to do anything to figure out what was wrong with the spar. And while Oceaneering wants to rely so desperately on Chevron Run in this case, the fact of the matter remains that Oceaneering was involved in the study of what went down. They were involved in the repair to the spar. They were involved in taking the bolts out and putting the bolts back in. They have the information, and they chose not to submit anything either to the trial court or this court that shows what the physical damage is. And Judge Davis, you pressed and pressed, and so did you, Judge King, trying to get information out about what exactly is the nature of the damage to the spar. We've been trying to get that information out of Oceaneering since 2004 when they first presented a claim. Now, once the bolts had to be replaced, and I can imagine Chevron, you know, they've got this spar out there that's very expensive. They're looking at $3 million, $4 million to replace these bolts. It's a significant issue for them. And so they end up hiring a law firm. They hired Miles Clements and his law firm to look into this. He got the investigation. He drafted a lawsuit. He filed his original complaint in September of 2003. And lo and behold, there was not a mention, a reference, a whiff of information about property damage. It was all about replacement costs of the bolts. He filed a first amended complaint in September of 2003. Again, no reference, no mention, no nothing about property damage. He filed a second amended complaint in September of 2005. Now we're two years into the litigation. No mention of property damage. I don't believe for a minute that Chevron's lawyer or the people that he reported to inside Chevron simply forgot to allege a major damage component in their case. Well, wouldn't a threat to the stability of the riser and maybe in turn the spar be property damage? Judge, there is no mention of that anywhere. There is no one who ever testified. And if you'll allow me, you know, if there was property damage to the spar, don't you think that there would have been a survey done? Where's that? Would there have been engineering drawings for repairs? Would there have been bids? Would there have been budgets established? I mean, I think they're, to me, what I assume Chevron was worried about was if they didn't replace these bolts, then, you know, the whole thing could come crashing down. The riser could fall apart and so forth. That is not in the record anywhere, and I'll make that representation, because Chevron actually put on the project manager who testified. It was Mr. Harmon. And actually, in Mr. Clement's opening statement at the underlying trial, he said that all of the damage from the problems from these prior cracks was over and gone. That's in the record. Over and gone. It has nothing to do with this case, he said. And then he told the jury, he said, if you'll pardon me while I pull out my glasses here, We had to file this lawsuit to recoup, to ask for compensation, simply for the hard out-of-pocket costs that Chevron had to incur to pay to put the right bolts in the second time, because the right bolts didn't go in the first time. That was a little, that was a cost of a little over $3 million, between $3 million and $3.1 million. Mr. Harmon, who was the project manager, will give you testimony to describe what those expenditures are. We have a stack of invoices this high, indicating. Mr. Herman read every single one. He was Chevron's manager on the project. He will say this is what Chevron is out-of-pocket, not dealing with loss of production or profits or any of those kinds of expenses, just what Chevron paid over $3 million to get the right bolts in place for the defective and wrong bolts. Nothing about any concerns about the spar tipping over or being unstable. Then we've got Mr. Herman, and this is from June 12, 2007, testimony, volume 2, pages 63, lines 17 to 64, line 16. He says, in response to Mr. Clement's questions, were all of the invoices coded for bolt replacement review submitted to Chevron and reviewed at that time? Answer, yes, they were. As the invoices came in, were they submitted to Chevron, reviewed, and approved and paid? I'm sorry, he said, this is his testimony, yes, they were. As the invoices came in, they were submitted to Chevron, reviewed, and paid. Testified that they were reasonable and necessary. Then he says, questioned by Mr. Clement, more recently in preparation for this trial, did you personally review all of the documentation behind the invoices for the bolt replacement? I did. I spent two days reviewing invoices to make sure that, you know, what we had in our claim was accurate and actually work that was required to replace the bolts. So during the course of that work, I actually removed any charges that we would have normally incurred on the project, you know, had the bolts not been needed to be replaced. So the damages there are strictly for bolt replacement. Well, but doesn't it make sense that if you've got the majority of the bolts that are in place in the riser, you know are defective and you can't rely on them, that that's damage to the riser? No, Judge, there's no evidence of that. Well, I mean, we know the other two bolts failed, and surely there's evidence that the reason they replaced the other bolts was because they knew they were defective. Well, I think they were just concerned that the riser bumpering system, fendering system could come off. There's no indication that any of it, and that's where I say follow the money. There is nothing that was paid to Chevron, nothing reduced to judgment, and then eventually paid up that had anything to do with anything other than pulling a bolt out, putting a bolt in. Pulling a bolt out, putting a bolt in. And if they had those two bolts. The cylinder bolts were actually sheared off, so those were damaged. Well, the bolts were, but that was part of your work under the policy, and that's where we get back to what Mr. Orlando was saying earlier. Oceaneering had a substantial hand in this, and that's why Magistrate Judge Smith found that it constituted your work under the policy. Because Oceaneering handled the bolts. They ended up passing them off to Auker. Auker took them with instructions from Oceaneering to use those bolts, and so that's where he found that. Damage to the product itself is not property damage within the meaning of the policy. It has to be tangible, physical damage to tangible property or the loss of use thereof. And there's simply no evidence of that in this case. All that we have is the money that was paid was simply for pulling bolts and putting them back in. You know, the Texas Supreme Court case of Lamar Holmes cast some doubt on what you just said that any kind of work that you do, defective work, is not covered under the policy. And I think that's what we're saying. Defective work is not covered under the policy. I say I've cast doubt on that conclusion. I mean, you know, they said that physical injury to tangible property that is the insurer's work, that is the defective product itself, may be property damage that's covered. They said faulty workmanship that simply diminishes the value of the house at issue without causing physical injury does not involve property damage that's covered. But it's either that case or Judge Rosenthal's opinion. I've forgotten the name of the case off the top of my head, something builders. But that goes on to state that if there is collateral damage, it has to be sued for and it has to be reduced to judgment. The insurer's obligation to indemnify is determined by the evidence adduced to trial. And in this case, the evidence adduced to trial was that there was nothing more than bolt replacement. And that's that's where I think Oceanary fails. And again, if they have evidence and they should have the evidence in their offices in Houston, they participated in the study. They participated in the replacement. They participated in the work, but they didn't ever present anything to show that there was any physical damage to tangible property. And again, you know, there were just no documents such as invoices, vessel manifest for carrying property out there for the repairs, no final approval on the repairs. But Mr. Clement in his closing argument again reiterated that it was just for the replacement of the bolts that Chevron was patent or seeking. And when you look at what they were asking for, they asked for three million eight thousand dollars from the jury in that case, and they were awarded two point nine. So there's no evidence at all that Oceanary is indebted to any degree for anything other than damages that are not covered. The brief talk about this Libby Owens case, I think that's another circuit. I can't remember which one, but it seems fairly relevant there because of the affected work. One of the windows of one part of the window was broken and the court said that because part of the window was broken, this created a public danger that the other windows would break. And drawing the remaining windows was a continuation of the injury that had already occurred. And they said that because all the windows were one product, there was no sister product involved. So here we've got two bolts that are, that fail. And we know that all the other bolts are apparently undisputed, that the other bolts were just like those two that failed and were demonstrated to be defective. So why wouldn't, I mean, if we followed the reasoning of that case, wouldn't that cover the replacement of the other bolts? Well, I think probably in that case, Judge, there was evidence that that other window was going to fail. Somebody probably testified it was going to fail. That didn't happen in this case. They were concerned that the bolts were out of spec, and that's why they went and replaced them all. But there's no evidence that those other bolts were going to fail. There was no one who ever suggested that or intimated that. And again, we filed the entire transcript. What about this business about the heat treatment or something? These bolts were defective, not just out of spec. They were defective, all of them. There was a problem with the bolts based on the instructions that were given because the heads twisted off. They were represented to be one grade of bolt, and they used the torque value for another grade of bolt. So the bolts weren't per se defective. There was an improper procedure for the type of bolt that they were using. They couldn't get the cost to replace them unless they had to be replaced. Exactly. They got the cost of replacement, but the cost of replacement isn't a covered loss under the policy. And that's what we're finding about. Chevron got its money, and Oceaneering participated in replacing those bolts. There must have been a finding then that all the bolts were defective if they awarded judgment. No, Judge, there was no finding on that. Well, but what would be any other? Well, as I've read from the expert's testimony, from the project manager's testimony, and as I've read from Mr. Clement's arguments to the jury, they were there to just get the replacement cost of the bolts. They said they had a concern about those bolts staying there because a few of the heads had popped off. So they figured out that they were the wrong grade bolt for the job. What do you mean they were defective? They were defective. Every bolt was defective. And every bolt had to be replaced because each one of them was defective. But that doesn't reach whether or not it's covered under the policy. Why don't you follow that reasoning of the Libby Owens case? I'm sorry? The Libby Owens case I just mentioned to you where one part of the window was defective, and they said we've got to replace the whole window because it may be a public danger. And that goes to the sistership exclusion that Magistrate Smith had us win on. That's what he granted us summary judgment on. No, but they found first it was property damage. Well, that's different than here because there isn't evidence of property damage. Judge Rosenthal, in the building specialties case, she says that the incorporation of one product, a smaller product, into a larger product doesn't necessarily create property damage even if it's effective. And I think if you read Rosenthal's opinion, it's really on all fours with this. Even to the extent there was, quote, property damage, as they said in Chevron 1, which I agree is a totally different issue. Is Judge Rosenthal's opinion on appeal? I'm not sure. It's a fairly old opinion, isn't it? Yeah, it is. It's 2010. So I don't think it's on appeal. At least we didn't find anything on it. But in any event, they haven't demonstrated anything showing that there was a covered loss under the policy. Yes, there was a loss. And as I was starting to get to with Chevron 1, that case where they mentioned property damage was decided on a completely collateral issue. The court was struggling with whether or not Chevron had a claim under Redhibition or under the Louisiana Products Liability Act. And because of the way Chevron's damages were characterized, what they said is that economic loss would include the cost of the product and loss of income or profits resulting from the loss or the inability to use the product as intended under Redhibition. And so what they did is they found that it didn't fit the definition of damages under Redhibition. So the court found that there was – they had to plug it into something. So they found liability under the Louisiana Products Liability Act, which has a far broader definition of property damage and damage than does the policy, which says there has to be physical damage to tangible property or the associated loss of use thereof. There's no evidence of loss of use in this case. There's no evidence of property damage to this bar. The product – a couple of bolt heads popped off. They decided to go ahead and replace them, which is why – and I think Judge Smith struggled with the notion of grappling with the property damage issue because he didn't want to take a swipe at the circuit because Chevron 1 did use the words property damage. And so he found the sister ship, which I think he was absolutely correct on. There were some defective parts, and the rest of them weren't, and they took them out and shipped them off and replaced them. And that's not covered under the policy. So in all respects, there's no coverage under this policy for any claim that Oceaneering has submitted. And again, if the court could, I would appreciate someone giving an answer out of Oceaneering as to what the damage was to this bar because once again, we've been trying to get that for over a decade. I know it's been a long day for you all, and I'm going to yield the minute and 27 seconds I have left. Thank you very much. All right. Thank you very much. Okay, Mr. Orlando. Is there any evidence in the record or the trial record of the other case that Chevron replaced the remaining bolts because they were concerned about the stability of the riser or the spar? I don't think so, Your Honor. If that had come out, it would be in the record. You didn't put anything in on that. No, because I don't think it's in there. Admittedly, this is speculation, but it's well-founded speculation. Chevron tried that original case. Chevron won on the basis that it wanted to get its attorneys' fees, and the only way it was going to get its attorneys' fees was the redhibition claim, which is a warranty, what Texas law would consider a warranty claim. Chevron made the identical arguments American Home is making right here. Chevron 1 says, Chevron acknowledges that it did not submit evidence for the jury to award damages based on damage to the bolts themselves, but it argues the cost of repairing the spar is economic loss under LPLA, entitling it to attorneys' fees. We believe Chevron is incorrect. This court in Chevron 1 disagreed with Chevron's position that what the damages that Chevron was seeking were purely economic loss damages, and that case goes on to say, this is Chevron 1, in light of these authorities, Chevron's damages incurred repairing the spar are not economic loss. The undisputed facts here show that the defective products, the bolts, have damaged other property, the spar. I can't tell you what Chief Judge Jolly meant when he said that, whether it was a unanimous decision of the panel. I can't tell you what the panel was thinking, whether it was a stability issue or not. Stability was the issue that started the entire process with redesigning the riser system because of the crack in the hull, so that is not a stretch to believe that that's what the panel must have had in mind, because that was Chevron's position, exactly what American Home's position is here, that it was purely damages to the bolts themselves, to replace the bolts themselves. This court will have to, in essence, disclaim Chevron 1 and Chevron 2 for this court to hold there was no damage to the Genesis spar. Chevron would have gotten its attorney's fees in Chevron 1 had this court found that there was no other damage, which is what's required, other damage to the spar, property damage to the spar. Chevron would have gotten its attorney's fees. If this court says otherwise now, Chevron must be thinking, why didn't we get our attorney's fees in Chevron 1? Same thing with Chevron 2. Why would Oceaneering owe the indemnity in the first place if it weren't based on that master service agreement that was based on either personal injury or property damage? Why did Oceaneering have to pay $2 million to Ocker, of which now we're fighting to get back from our own insurer, if there hadn't been property damage to the spar? That was what the MSA was for. So for this court to now come behind the two prior decisions that have been issued here would be to say we were wrong when we decided the way we decided Chevron 1 and we were wrong when we decided Chevron 2 either. This court need only read the two prior underlying decisions, which are the law of this case. We're not talking about some other case, some other dispute, something else. We're talking about what two panels of this court has decided already. And as Judge Davis, you aptly pointed out, that case involving the windows out of the First Circuit, this is despite what American Home wants to believe. They did not deny coverage on the Your Work exclusion. They did not deny coverage on the Your Product exclusion. They did not deny coverage on the Impaired Property exclusion. They denied it on the Product Recall exclusion, the Sistership exclusion. And there's no way to – that case, the Sistership exclusion, simply has no bearing. The case that was relied on by Judge Smith is a proper case, the High Court case. It's a case in which a batch of antifreeze was manufactured. The first time I think the antifreeze was shipped to somebody and it was determined that that part that was being used was defective. And so the entire batch distributed all over the United States where it was distributed had to be removed. Thank you very much. Thank you. Thank you, gentlemen. We have your argument and the court will be in recess.